**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

V.V.L.S. PHARMACY, INC. d/b/a BANK'S
APOTHECARY,

                    Plaintiff,

          v.

CATAMARAN CORPORATION

                  Defendant.

Civil Action No. 2:15-cv-05234-AB

Hon. Anita Brody

**CATAMARAN CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF V.V.L.S. PHARMACY, INC. d/b/a BANK'S APOTHECARY'S
APPLICATION FOR TEMPORARY RESTRAINTS AND PRELIMINARY
INJUNCTION**

## PRELIMINARY STATEMENT

Defendant Catamaran Corporation ("Catamaran") submits this Memorandum of Law in Opposition to Plaintiff V.V.L.S. Pharmacy, Inc. d/b/a Bank's Apothecary's ("Plaintiff") motion brought by an Order to Show Cause and Plaintiff's Application for Temporary Restraints and Preliminary Injunction filed pursuant to Federal Rule of Civil Procedure 65 ("Rule 65") on September 18, 2015.

Catamaran is a pharmacy benefit manager ("PBM") that maintains a network of approved pharmacies for its client health plans. In 2014, Plaintiff was an approved pharmacy within that network. In January 2015, pursuant to its contract with Bank's, Catamaran began an audit of Plaintiff's prescriptions which identified numerous issues, including dispensing errors, inventory shortfalls and coding errors. That review resulted, in May 2015, in a decision to terminate Plaintiff from Catamaran's network. Now, faced with imminent termination, Plaintiff alleges that Catamaran breached its contract and asks this Court to prevent Catamaran from acting pursuant to its contractual rights by enjoining Catamaran from removing Plaintiff from its network of providers. Plaintiff requests an order "restraining and enjoining [Catamaran] from (1) terminating Plaintiff from one or more of its pharmacy provider networks, or otherwise terminating the parties' underlying pharmacy agreement, and (2) communicating verbally and/or in writing to plan sponsors, PSAOs, hospitals, patients, members, prescribers and entities that Catamaran serves as third-party administrator of pharmacy benefits, that Plaintiff has been terminated from one or more of Catamaran's pharmacy provider networks." Plaintiff's Brief at 25.

Plaintiff's motion should be denied in full.  First, Plaintiff has not alleged a viable claim for breach of contract and thus cannot show a likelihood of success on the merits of its claim.[1] Second, Plaintiff has not identified any legally-cognizable "irreparable harm" that it will suffer if terminated and excluded from Catamaran's network.  Third, both the equities and the public interest weigh in favor of allowing Catamaran the ability to ensure the quality of its network pharmacies' operations and, ultimately, the health and safety of the patients of its client health plans.

## II.    FACTUAL BACKGROUND

Catamaran is a pharmacy benefit manager.  As such, it provides products and services intended to assist in the development and administration of pharmacy benefits offered through health benefit plans.  These products and services include processing claims for pharmacy benefits as well as the development and administration of drug formularies and pharmacy networks.

Bank's Apothecary is an independent specialty and retail pharmacy.  Compl. ¶ 22.  To gain access to PBMs' pharmacy networks, pharmacies such as Bank's often enter into agreements with Pharmacy Services Administrative Organizations ("PSAOs") to manage certain of their administrative functions, including network contracting.  PSAOs can serve as a single point of contact with a PBM on behalf of many pharmacies, making it easier for the pharmacies to enter into PBM networks.

---

[1] Plaintiff's attached Complaint ("Complaint") also identifies causes of action for (i) Breach of the Implied Covenant of Good Faith and Fair Dealing; (ii) violation of the Illinois Antitrust Act; (iii) violation of the Federal Any Willing Provider Law; and (iv) violation of the Pennsylvania Unfair Insurance Practice Act.  Plaintiff makes no argument in support of these claims in its motion for injunctive relief and thus they cannot be the basis of any Court-ordered restraint.

Bank's became a member of Catamaran's network through a PSAO called AccessHealth. According to Catamaran's records, Bank's became a network provider through AccessHealth in 2010 and continues to be a member today. Pursuant to the Provider Agreement between AccessHealth and Catamaran, AccessHealth "is the contracting representative on behalf of its pharmacy members," including Bank's. The Provider Agreement lists certain responsibilities of the pharmacy, including

- Compliance with all local, state, and federal laws, including those relating to the operation of a pharmacy;

- Maintenance of claim information submitted to Catamaran, including the prescription number, the date of dispensing, the product dispensed, the amount dispensed, and other information; and

- Provision of any information that Catamaran may reasonably require to verify compliance with the Provider Agreement and local, state, and federal laws.

*See* Provider Agreement, Pl. Ex. B at § 3(a)-(l), § 5. Section 8 of the Provider Agreement governs its termination. Section 8.3 states that Catamaran may terminate the Agreement "effective immediately upon notice to Pharmacy and Agent of Pharmacy for actions of Pharmacy deemed by [Catamaran], in its sole discretion, to be detrimental" to the pharmacy network.

Each member of Catamaran's network (including Bank's) also receives a Provider Manual "designed to explain some of Catamaran's administrative and compliance procedures as they relate to providers[.]" Provider Manual, Pl. Ex. A at 1; *see also* 3/3/2015 Provider Manual Update ("Manual Update"), attached hereto as Defendant's Exhibit 1, at 1.[2] The Provider

---

[2] The Provider Manual was updated in March 2015. Under the terms of the relevant contracts, Bank's was "responsible for monitoring and complying with all changes to the Provider Manual." Pl.'s Ex. A at 1. As a result, the audit of Plaintiff's records occurred under the Provider Manual attached to Plaintiff's memorandum as Exhibit A

3

Manual, which is "incorporated into [the] Participating Provider Agreement[s] with Catamaran" confirms that the Catamaran/Bank's agreement may be terminated according to its terms or immediately "for cause." *Id.* at 1, 27, *see* Def. Ex. 1, Manual Update, at 1, 31 (same). The Provider Manual further stipulates that member pharmacies "must provide pharmacy services related to a covered item to all patients of all plan sponsors in compliance with the Provider Manual, and as set forth within the Provider Agreement." *Id.* at 25; *see also* Def. Ex. 1, Manual Update at 29. The Provider Manual also makes clear that non-compliance could result in "certain remediation actions [. . . ] including but not limited to a Corrective Action Plan (CAP), termination of the Provider Agreement and any other available recourse." *Id.* at 25; *see also* Def. Ex. 1, Manual Update at 29. "Final determination will be made by the PMEC [Pharmacy Membership Evaluation Committee] and may include action up to and including termination from the Pharmacy Network." *Id.* at 27-28; *see also* Def. Ex. 1, Manual Update, at 31-32 (same).

Under the terms of the PBM-pharmacy contract, Catamaran has the right to audit member pharmacies. *Id.* at 15; *see also* Def. Ex. 1, Manual Update, at 18. In early January 2015, Catamaran invoked that right and audited Bank's in an attempt to verify "medication and supply purchases[.]" Letter from Olga Weinberg, CPhT, SIU Investigator, Catamaran, to Bank's Apothecary, attached hereto as Ex. 2, at 1 (Jan. 6, 2015). Pursuant to the audit, Catamaran requested that, by January 9, 2015, Bank's provide Catamaran with "a pharmacy contact as well as any and all wholesalers/distributors from which your pharmacy obtains its medications and

---

and the PMEC review and termination decision under the March update. There are minor differences between the two manuals and they are accounted for in our briefing.

supplies." *Id.* Catamaran also requested "Purchasing Invoices or Wholesaler Confirmation Reports" for specified drugs and other documentation by February 3, 2015. *Id.* at 1, 4. Banks provided some of the requested documents in advance of the February 3 deadline but failed to provide others. On February 4, 2015, Catamaran followed up with Bank's in a second letter, indicating it had concluded its investigation into the discrepancies and the "difference will be recovered from a future pharmacy payment." Letter from Olga Weinberg, CPhT, SIU Investigator, Catamaran, to Bank's Apothecary, attached hereto as Ex. 3, at 1 (Feb. 4, 2015). This second letter provided for a ten-day period during which Bank's could appeal the decision. *Id.* In it, Catamaran made clear that "failure to comply with the invoice review process and close this review with an acceptable outcome may also result in suspension of payment and/or possible termination from the network." *Id.*

Upon receipt, on February 9, Bank's requested and received a thirty day extension of the appeal period and, on February 24, asked for yet another thirty day extension. Letter from Steven Bennet, Esq., Frier & Levitt, LLC, to Olga Weinberg, CPhT, SIU Investigator, Catamaran, attached hereto as Ex. 4, at 1 (Mar. 13, 2015). Catamaran granted an additional seven days. *Id.* at 2.

After reviewing the additional documents submitted by Bank's, Catamaran sent Bank's a third letter on March 27, 2015 indicating that the "review is now considered final" and warning Bank's again of possible termination. Letter from Olga Weinberg, CPhT, SIU Investigator, Catamaran, to Bank's Apothecary, attached hereto as Ex. 5, at 1 (Mar. 27, 2015). The audit and review identified dispensing errors, inventory shortfalls, coding errors and other discrepancies which caused overpayments to Bank's totaling $57,901.23. *Id.* at 1-4. On April 10, 2015,

Catamaran notified Bank's that its Pharmacy Membership Committee ("PMEC") was reviewing its network participation because of inventory and licensure issues. Compl. ¶ 44. Although the notice provided Bank's with six days to submit supplemental documents, Bank's instead provided the documents nearly three weeks later, on April 30, 2015, after again requiring an extension. *See id.* at ¶¶ 44-48. On May 15, the Catamaran PMEC voted to terminate Bank's Apothecary's membership. Bank's received notice of termination on or shortly after May 20, 2015, effective after 30 days. *Id.* at ¶ 50. Again, Bank's requested additional time to respond and again Catamaran agreed to provide it. *See id.* at ¶¶ 50-52. On June 16, 2015, Bank's sent a letter from its attorneys "invoking the Dispute Process detailed in 1C of the Catamaran Provider Manual." Letter from Steven Bennet, Esq., Frier & Levitt, LLC, to Elisa Muller, Senior Legal Counsel, Catamaran, attached hereto as Ex. 6, at 1 (June 16, 2015).

On July 13, 2015, Catamaran's Senior Counsel, Elisa Muller, Director of Pharmacy Compliance, Tom Irvin, and Senior Director of Pharmacy Audit and Compliance, Kerri Tanner, participated in a conference call with Bank's Apothecary Chief Executive Officer, Srinuvasu Maddula, to discuss a potential Corrective Action Plan to address Bank's Apothecary's operational deficiencies. Compl. ¶¶ 59-61. On August 13, 2015, Bank's finalized its proposed Corrective Action Plan. *Id.* at ¶ 63. Thereafter, the PMEC reviewed Bank's Apothecary's response to the termination notice, including the proposed Corrective Action Plan. Letter from PMEC, Catamaran, to Bank's Apothecary, Pl. Ex. D (Aug. 27, 2015). On August 27, 2015, the PMEC informed Bank's of its decision to uphold termination and remove Bank's as a provider, effective in thirty days. *Id.*

On September 18, 2015, Bank's filed a complaint in the Eastern District of Pennsylvania alleging (i) Breach of Contract ; (ii) Breach of Good Faith and Fair Dealing; (iii) Violation of the Illinois Antitrust Act; (iv) Violation of the Federal Medicare's Any Willing Provider Law; and (v) violation of the Pennsylvania Unfair Insurance Practice Act.  Compl. ¶ ¶ 221-48.  Bank's now seeks a temporary restraining order preventing Catamaran from terminating Bank's from the Catamaran network on September 28, 2015.  *See* Compl. ¶ 13.

## III.    PLAINTIFF CANNOT DEMONSTRATE ENTITLEMENT TO INJUNCTIVE RELIEF

### A.    STANDARD OF LAW

A temporary restraining order "is an 'extraordinary remedy, which should be granted only in limited circumstances.'"  *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)).[3]  In deciding a motion for a temporary restraining order or preliminary injunction, courts must weigh "(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest."  *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 556 (3d Cir. 2009) (quoting *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356–57 (3d Cir. 2007)).  "The movant bears the burden of showing these four factors weigh in favor of granting the injunction." *Ferring*, 765

---

[3] Under Federal Rule of Civil Procedure 65, temporary restraining orders and preliminary injunctions are weighed identically.  *See Pileggi v. Aichele*, 843 F. Supp. 2d 584, 592 (E.D. Pa. 2012) (citing *Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa. 1994)) ("The standard for granting a temporary restraining order under Federal Rule of Civil Procedure 65 is the same as that for issuing a preliminary injunction.").

F.3d at 210.  If the moving party fails to demonstrate that any of these four factors weigh in favor of preliminary injunction, the remedy is "inappropriate."  *Id.* at 210 (quoting *NutraSweet Co. v. Vit–Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir.1999)).

### B.    PLAINTIFF HAS NOT IDENTIFIED A BREACH OF CONTRACT

The gravamen of Plaintiff's petition for injunctive relief is an alleged breach of an unspecified "boilerplate contract" between Catamaran and Bank's Apothecary.  Pl. Br. at 11. Plaintiff asserts that Catamaran has breached "the contract through termination without proper basis, breach of the Dispute Process through unilateral incorporation of additional terms and conditions, and through termination during the pendency of the dispute."  Pl. Br. at 2.  Under Illinois law,[4] to prove a breach of contract, Plaintiff "must establish an offer and acceptance, consideration, definite and certain terms of the contract, plaintiff's performance *of all required contractual conditions*, the defendant's breach of the terms of the contract, and damages resulting from the breach."  *Mannion v. Stallings & Co., Inc.*, 561 N.E.2d 1134, 1138 (Ill. Ct. App. 1990) (emphasis added); *see also Van Der Molen v. Washington Mut. Fin., Inc.*, 835 N.E.2d 61, 69 (Ill. Ct. App. 2005).  Because Plaintiff cannot identify any contractual terms breached by Catamaran and cannot establish its own "performance of all required contractual conditions," Plaintiff cannot state a claim for breach of contract under Illinois law.

Plaintiff does not dispute that Catamaran's January 2015 Audit ("the Audit") and follow-up investigation identified quality and inventory control issues at Bank's, including dispensing

---

[4] Illinois law applies pursuant to the choice-of-law provisions in the Provider Agreement and Manual. *See* Pl. Ex. A at 2.

8

mistakes based on NDC coding errors.[5]  Further, although Plaintiff's breach of contract claims (and thus its claim for injunctive relief) are based on purported violations of the "Dispute Process" outlined in the Provider Manual, Plaintiff's own pleadings make clear that Catamaran complied with it in all material aspects.  Plaintiff does not identify any specific contractual language from which Catamaran allegedly deviated nor any actions taken by Catamaran that are foreclosed under the relevant contracts.  A review of the contractual language makes clear that Plaintiff's termination occurred pursuant to processes disclosed, and described, in Sections 3, 4, and 5 of the Provider Manual.  *See* Def. Ex. 1, Manual Update, at 18-20, 29-31; *see also* Pl. Ex. A at 15-16, 25-28.  Those sections identify not just the standards of compliance required of Plaintiff and Catamaran's audit authority, but also the grounds and procedure for initiating termination.  Although these sections directly apply to the events at issue, they go wholly unmentioned in Plaintiff's briefing.

### 1.    Plaintiff Breached the Provider Agreement and Catamaran Acted Within Its Contractual Rights

It is undisputed that, in January 2015, Catamaran began an audit of Bank's Apothecary's prescribing operations.  *See* Pl. Br. at 2.  It is further undisputed that Catamaran's audit revealed discrepancies in Bank's Apothecary's prescription dispensing process, which triggered a more thorough investigation into Bank's Apothecary's operations.  *Id.* at 3.  Plaintiff does not allege that the audit was improper.  Indeed, pursuant to its contract with Bank's, Catamaran was entitled to conduct a variety of audits of Bank's Apothecary's operations, including

---

[5] The National Drug Code is a unique 10-digit, 3-segment numeric identifier assigned to each medication listed under Section 510 of the US Federal Food, Drug, and Cosmetic Act. The segments identify the labeler or vendor, product (within the scope of the labeler), and trade package (of this product).

"investigational audits" like that applied in this instance, which are utilized to verify the accuracy and validity of claim submissions and verification of medication and supply purchases. Pl. Ex. A at 15; *see also* Def. Ex. 1, Manual Update, at 18. Investigational audits are both broad and deep, necessitating the collection and analysis of a wide-range of documents, including, but not limited to, "original prescriptions, signature logs, computer records, and invoices showing purchase or receipt of dispensed medications." *Id.* at 15; *see also* Def. Ex. 1, Manual Update, at 18 (same).

These audits are important. They help to ensure that pharmacies are dispensing medications safely and accurately, maintaining appropriate control over their inventory, and accurately billing for the medications they dispense. The ramifications for a pharmacy that refuses to participate or fails an audit can be severe. The Provider Manual clearly states that the results of these audits "may include the imposition of fines or penalties due to repeated audits*, termination from the network,* [and] corrective action plans." *Id.* at 16 (emphasis added); *see also* Def. Ex. 1, Updated Manual, at 20 (same). The Provider Manual also makes clear that "noncompliance" with the Provider Manual or Provider Agreement may subject a Provider to "certain remediation actions . . . including, but not limited to a Corrective Action Plan (CAP), *termination of the Provider Agreement* and any other available recourse." Def. Ex. 1, Manual Update, at 29 (emphasis added); *see also* Pl. Ex. A at 25 (same). Further, the Provider Manual provides that "Catamaran may *immediately terminate* the Provider for cause," including, but not limited to, violations of the standards identified above. *Id.* at 31 (emphasis added); *see also* Pl. Ex. A. at 27 (same). All termination decisions are within the discretion of the Pharmacy Membership Evaluation Committee ("PMEC"), and the PMEC's "final determination . . . may

include action up to and including termination from the Pharmacy Network." *Id.* at 31-32; Pl. Ex. A. at 27-28 (same); *see also* Pl. Ex. B at ¶ 8.3.

As noted above, although Plaintiff quibbles about the *extent* of the errors Catamaran identified during its audit, it does not dispute that Catamaran's audit of its operations identified improper dispensing, billing and inventory control practices in violation of the Provider Manual and Agreement.[6] Nor does it dispute that improper dispensing, billing and inventory control practices constitute grounds for termination under the contract. Instead, it argues that Catamaran's standards of compliance, enforcement authority, and its discretion to determine the pharmacies it includes in its network should be set aside because Bank's was in "substantial compliance" with the Provider Agreement and Provider Manual. Pl. Br. at 4. But Plaintiff does not cite to any contractual language permitting "substantial compliance" in lieu of strict compliance with Catamaran's expressly-stated standards of operation. Nor does Plaintiff cite to any Illinois law suggesting substantial compliance is sufficient to satisfy a contract with express requirements of total compliance. This is because, under Illinois law, substantial compliance or performance "d[oes] not extend to cases like the one before us, where [a party] insisted upon strict compliance with its conditions and has never waived them[.]" *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 636 (7th Cir. 1992). In other words, because Plaintiff concedes that it was not in compliance with its contractual requirements, its breach of contract claims cannot proceed. *See Mannion*, 561 N.E.2d at 1134 (to prove breach of

---

[6] Examples include, but are not limited to, Section 2, paragraph E, of the Provider Manual which states that "[o]nly the NDC of the actual product dispensed shall be submitted on the claim transaction," and that "[u]se of similar or NDC of a bottle size not dispensed is not permissible," Pl. Ex. A at 5, and Section 4, paragraph D, which identifies "submitting incorrect claim submission data," as non-compliance. *Id.* at 25.

contract, plaintiff must first show its "performance of all required contractual conditions"). Plaintiff's assertions that it was "close enough" do not suffice.

> **2.    Catamaran Did Not Alter, Amend, or Violate the Dispute Resolution Process Requirements as Provided Under the Catamaran Manual**

Unable to allege a violation of any specific contractual terms, Plaintiff alleges instead that Catamaran deviated from a mandatory Dispute Resolution process identified in the Provider Manual. Plaintiff asserts that "[o]n June 16, 2015, Banks initiated the Dispute Process to stay termination and allow the parties to negotiate a good faith resolution to the dispute." Pl. Br. at 6. Plaintiff alleges that Catamaran subsequently breached its contract with Bank's when it "add[ed] the PMEC approval as a condition of resolution," and (ii) "attempt[ed] to terminate Banks while it engage[d] in the Dispute Process." Pl. Br. at 12. The Dispute Process provisions in the Provider Manual state, in relevant part:

> The dispute will be submitted in writing for resolution to a panel consisting of one (1) senior executive from Catamaran and one (1) senior executive from Provider. If the parties have not resolved the dispute through the foregoing process within thirty (30) days of the start of such Dispute Process proceedings, then either party will have the right to pursue judicial action . . . . The parties' performance under any Agreement will not be suspended during the pendency of any Dispute Process procedures contemplated her[e]in unless otherwise agreed in writing between [the] parties.

Pl. Ex. A, at 2; *see also* Def. Ex. 1, Manual Update, at 1-2 (same). As explained more fully below, Plaintiff cannot identify any actions taken by Catamaran that violated the terms of this provision and thus Plaintiff's claims are without merit.

Plaintiff alleges that, "[o]n July 13, 2015, Catamaran and Banks participated in the Dispute Process Panel through a conference call with the requisite senior executives." Pl. Br. at

6. Following that call, on July 17, Bank's drafted a Corrective Action Plan and submitted it to Catamaran. *Id.* Catamaran "edited and commented upon" Bank's Apothecary's proposed CAP, and, on August 10, a final draft was agreed upon. *Id.* According to Plaintiff:

> ***Banks executed the Corrective Action Plan as edited by Catamaran***. Notwithstanding these efforts, on August 27, 2015, Catamaran PMEC terminated Banks while the Dispute Process was pending. The letter indicated that the PMEC had reviewed the Corrective Action Plan and rejected the positions of Mr. Irvin and Mrs. Tanner, the Director of Pharmacy Compliance and Senior Director of Pharmacy Audit and Compliance.

Pl. Br. at 6-7 (multiple emphases in original). Plaintiff contends that Catamaran's submission of Bank's Apothecary's proposed CAP to the PMEC constitutes a breach of contract because "[t]here is no contemplation of the Dispute Process requiring input or approval from the PMEC."

Pl. Br. at 12. The Provider Manual is clear, however, that:

> The Pharmacy Membership Evaluation Committee (PMEC) will determine the extent to which a breach has occurred and will make a determination in regards to participation status or the need for further review and recommendations. *Final determination* will be made by the PMEC and may include action up to and including termination from the Pharmacy Network.

Def. Ex. 1, Manual Update, at 31-32 (emphasis added); *see also* Pl. Ex. A at 27-28 (same). Contrary to Plaintiff's apparent understanding, nothing in the language of the Dispute Process stipulates that Plaintiff's engagement in the process must result in a resolution favorable to Bank's. Pl. Ex. A at 2 ("If the parties have not resolved the dispute through the foregoing process within thirty (30) days of the start of such Dispute Process proceedings, then either party will have the right to pursue judicial action…"); *see also* Def. Ex. 1, Manual Update, at 1 (same). Nor does the Dispute Process abrogate the PMEC's "final authority" on termination decisions.

13

Indeed, it is clear both from the facts and the contractual language at issue that, with regard to Plaintiff's audit, termination, and appeal, the PMEC acted pursuant to its contractually-delegated and delineated authority. *See* Def. Ex. 1 at 31; *see also* Pl. Ex. A at 27; Pl. Ex. B at ¶ 8.3.[7]

The Dispute Process is just that, a *process*. As such, it provides one path for *potential* resolution of a dispute. It does not require that the parties actually resolve the dispute, nor does it restrict the parties from taking otherwise permissible action (except pursuit of judicial action within the first thirty days) if the dispute is not resolved.[8] In short, the Dispute Process places no obligation on either party if the dispute is not resolved within thirty (30) days after the start of the Dispute Proceedings. Here, Plaintiff alleges that the Dispute Proceedings were commenced on June 16, 2015. The dispute was not resolved within thirty (30) days, at which point there were no further conditions on Catamaran's conduct. When the PMEC voted to terminate Plaintiff on August 17, 2015, pursuant to Catamaran's rights, its actions were squarely within those contemplated by the contract.

This timing is also fatal to Plaintiff's allegation that Catamaran violated the Dispute Process by attempting to terminate Plaintiff while it engaged in the process. As above, Plaintiff can point to no language in the Provider Manual to support its position; instead, the Dispute Process language compels the opposite result. Even if the Dispute Process could be read as

---

[7] Plaintiff's interpretation – which would provide a path around the termination process for pharmacies – effectively strips the PMEC of its authority over network membership by removing its power of final review, rendering the termination provisions of the Provider Manual irrelevant and ineffective. Such a reading goes against the fundamental tenets of contract interpretation. *See Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1105 (7th Cir. 1997) ("We must, of course, interpret a contract as a whole, and we must try to give meaning and effect to each provision in the contract.").

[8] In other words, all of the rights and obligations of the parties, including Catamaran's right to terminate the provider agreement, remain in full force during the pendency of the Dispute Process.

14

suspending Catamaran's rights (including termination) under its contracts during the pendency of the process, the contract clearly stipulates that such a suspension expires after thirty days. Because Plaintiff alleges it invoked the Dispute Process on June 16, 2015 and concedes that Catamaran gave Plaintiff notice of contract termination effective September 26, 2015, more than ninety days after it invocation, Plaintiff has not identified any breach of the 30-day window of negotiation contemplated in the Dispute Process provisions.

In short, Plaintiff is unlikely to succeed on the merits of its breach of contract claim. It cannot prove that it performed all of its required contractual conditions, that Catamaran breached the terms of the contract, or that it has or will be damaged.[9] *See Mannion*, 561 N.E.2d at 1138. As a result, its motion for an order of temporary restraints must be denied.

### 3.    Plaintiff's Allegations Regarding Notice of Termination Are Illogical and Unavailing

Finally, Plaintiff alleges that Catamaran breached its contracts with Bank's by notifying its patients, "on or about June 2015," that Bank's would be "terminated from the Catamaran network and the patients [would] need to seek an alternative pharmacy for services." Pl. Br. at 4-5. Plaintiff does not dispute that its membership in the network had, as of June 2015, been scheduled for termination by PMEC. The fact that Plaintiff was engaged in a last-gasp attempt

---

[9] Even assuming that Catamaran improperly terminated Plaintiff's agreement "for cause" or breached the Dispute Process in the Provider Manual, Plaintiff has not been damaged. Pursuant to the Provider Agreement, Catamaran had the right to terminate the Provider Agreement with Plaintiff "with or without cause" on notice of thirty days. Pl. Ex. B at ¶ 8.2. Catamaran first notified Plaintiff of its intent to terminate the agreement in May 2015. Under the "without cause" termination provision, Catamaran was entitled to terminate the agreement in June 2015, but instead gave Plaintiff extensive opportunities over a three-month period to convince Catamaran to retain the relationship. Plaintiff cannot claim a breach of contract or injury arising out of a process which Catamaran was not obligated to offer in the first place.

to either repair its relationship with Catamaran or stave off its pending termination date does not change its status under the contract.

Plaintiff all but concedes that timely notification was proper and necessary to protect the public health. As Plaintiff acknowledges, any delayed notification means at-risk patients would "likely go without their necessary medications, at least for some period of time until they can find a new pharmacy to fill their [sic] and deliver them their prescriptions." Pl. Br. at 24. The common sense solution to this problem is, of course, to send out a notification *before* the date of ultimate termination, a process that allows individuals the opportunity to identify alternative sources for the prescriptions. Plaintiff's requests that no notification be circulated until the last possible moment flies in the face of its lofty rhetoric about its focus on customer care.[10]

### C.   PLAINTIFF WILL NOT SUFFER LEGALLY-COGNIZABLE "IRREPARABLE HARM" IN THE ABSENCE OF INJUNCTIVE RELIEF

#### 1.   Plaintiff's Claims of Damage to Business Do Not Constitute Irreparable Harm

Although Plaintiff concedes that "injury measured solely in monetary terms cannot constitute irreparable harm," it nonetheless argues that "Federal and State case law clearly supports a finding of irreparable harm when a plaintiff will be driven out of business if a TRO is not granted." Pl. Br. at 14. Plaintiff is mistaken. Courts of the Third Circuit have repeatedly

---

[10] Plaintiff also asserts that federal "Any Willing Provider" laws mandate that Catamaran be prohibited from terminating its contract. 42 U.S.C.A. § 1395w-104(b); 42 C.F.R. § 423.120(a)(8)(i). "In essence," Plaintiff states, the statute "prohibits health insurers from excluding providers from its Medicare network." Pl. Br. at 13. Plaintiff's interpretation is flawed on law, policy, and logic. The statutory language requires any Medicare Part D-participating "drug plan" to "permit the participation of any pharmacy that meets the terms and conditions under the plan." 42 U.S.C.A. § 1395w-104(b); 42 C.F.R. § 423.120(a)(8)(i). But, in terminating Bank's Apothecary's contract for cause, Catamaran determined that Bank's *did not* meet its standard terms and conditions. The statute defers to this determination, it does not override it. Plaintiff's interpretation would effectively pre-empt (or negate) any attempt by benefits plans at quality control within their network. Such a result is untenable.

held that, "even when an action will result in the destruction of a business," a District Court is "justified in refusing to grant preliminary injunction when the loss was 'capable of ascertainment and award at final judgment if petitioner appeals.'"[11] *Figueroa v. Precision Surgical, Inc.*, 423 Fed App'x 205, 211 (3d Cir. 2011) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F. 2d 797, 801 (3d Cir. 1989)); *see also AV Solutions, LLC v. Keystone Enter. Servs., LLC*, No. 11-3503, 2011 WL 2971222, at *3-4 (D.N.J. July 19, 2011) (assertion that failure to enjoin would "destroy […] customer base entirely" insufficient to establish irreparable harm).  It is not sufficient to simply allege that the termination of a contract will put an entire business at risk because "general statements to the effect that [Plaintiff] will no longer exist as a result of the termination" cannot establish irreparable harm as required by Rule 65. *Instant Air Freight Co.*, 882 F. 2d at 803; *see also In re Arthur Treacher's Franchise Litig.*, 689 F.2d 1137, 1146 (3d Cir. 1982).

Given the applicable Third Circuit law, Plaintiff's citations – including a one-off ruling regarding the dissolution of a stay of regulatory enactment pending Supreme Court consideration of a writ of *certiorari*, an overruled Connecticut state court injunctive class certification ruling that did not address the merits of the claims, and an inapposite Pennsylvania state court case regarding lost "business opportunity" – are at best disingenuous.  Here, the law is clear: Plaintiff's assertions that it will be "driven out of business" are no more viable than any other "monetary damages" claims and cannot satisfy the irreparable harm requirements of Rule 65. Plaintiff has not cited any relevant law that suggests otherwise.

---

[11] Plaintiff's own briefing makes just such an attempt at ascertainment, pegging Plaintiff's eventual losses at $4,800,000.  Pl. Br. at 9.

### 2.  Plaintiff's Allegations of Harm are Speculative and Unsupported

Plaintiff asserts, without any evidence, that it "will be forced to nearly immediately close its doors and shut down the business if it is terminated from Catamaran's network." Pl. Br. at 16. To be clear, this is not because Catamaran constitutes Plaintiff's entire business: Plaintiff acknowledges that it "will directly lose" only "20% of its business prescription volume due to the Catamaran termination." *Id.* at 15.  Cognizant, perhaps, that a 20% reduction in volume hardly constitutes irreparable harm, Plaintiff speculates that termination will trigger a domino-like chain of events, the only possible result of which will be "losing all of its business." *Id.*; *see also id.* ("Thus while Catamaran represents 20% of Banks prescription volume, a termination from Catamaran's pharmacy network will result in a *complete loss* of Banks' referral business."). Plaintiff's only "factual" support for this speculation is the unsubstantiated assertion that an unknown number of unidentified prescribers have "informed" it that "they will stop referring prescriptions to Banks if Banks cannot fulfill Catamaran beneficiaries' prescriptions." *Id.*

The law is clear, however, that speculative, contingent assertions of monetary loss, like those proffered by Plaintiff here, do not satisfy the requirement that a harm be imminent and irreparable. *See e.g., Acierno v. New Castle Cnty.*, 40 F.3d 645, 655 (3d Cir. 1994) (allegations of business-destroying "domino effect" on other business does not constitute irreparable harm). In the Third Circuit, "[e]stablishing a risk of harm is not enough," *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987), to prove the appropriateness of injunctive relief, and, in keeping with this, "the claimed injury cannot merely be possible, speculative or remote." *Dice v. Clinicorp, Inc.*, 887 F. Supp. 803, 809 (W.D. Pa. 1995). In other words, Plaintiff's speculative generalizations about possible monetary harm fall far short of the requirements of Rule 65.

18

Even if Plaintiff's speculated monetary losses *were* sufficient to constitute irreparable harm, however, its claims still fail for lack of evidentiary support.  Plaintiff relies on broad and vague characterizations of prescriber behavior, stating without support what "commonly," "generally," or "customarily" occurs in the industry.  Pl. Br. at 7, 16; *see also Instant Air Freight Co*, 882 F.2d at 803 (finding conclusory statements insufficient to warrant relief in the absence of factual evidence).  As noted above, Plaintiff alleges on several occasions that it "has been informed by its prescribers they will stop referring prescriptions to Banks," but Plaintiff does not identify these prescribers, let alone provide affidavits from them.[12]  The *only* factual support provided by Plaintiff is the affidavit of a single prescribing psychiatrist, Dr. Bonnie Wright, who offers the equivocal statement that she "*may not be comfortable* sending my prescriptions" to a pharmacy that, like Bank's, has been terminated from Catamaran's network.  Declaration of Bonnie Wright, M.D. at ¶ 22 (emphasis added); *see also* Pl. Br. at 16 ("it is customary for psychiatrists to only or primarily refer patients to those pharmacies that are members of every major Pharmacy Benefits Manager or insurance carrier network in the locale in which their office is located.").  Plaintiff does not supply any affidavits from *non-psychiatrists*.  Nor does Plaintiff offer any evidence that non-psychiatrist doctors will behave similarly.  In sum, Plaintiff's sole substantiation for the collapse of its business is the statement of a single prescribing psychiatrist who cannot say with any certainty what impact Catamaran's decision will have on her prescribing relationship with Bank's.  As a result, even if Plaintiff's claims of

---

[12] Although hearsay is admissible in support of a temporary restraining order or preliminary injunction that does not mean self-serving or unsubstantiated hearsay is *favored*.  In this case, hearsay provides Plaintiff's sole support for its argument of irreparable harm.

imminent financial devastation *could* constitute irreparable harm – and they cannot – Plaintiff has nonetheless failed to offer any evidence in support of those claims.

### D.    BOTH THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST GRANTING PLAINTIFF'S MOTION

Plaintiff asserts that "[g]ranting temporary restraints and preliminary injunctive relief will preserve the status quo and will *not* result in any harm to Catamaran." Pl. Br. at 16. In "stark contrast," Plaintiff alleges, "Banks would be put out of business." *Id.* at 17. This characterization is consistent with Plaintiff's posture throughout its brief; it consistently disregards Catamaran's obligations to its client health plans and their patient-members (and thus to the health and safety of the public), downplays the seriousness of its operational deficiencies, and dramatizes its own importance. But Plaintiff gets it backwards; instead, it is Bank's Apothecary's systemic errors and lack of quality control (that necessitated its termination) that pose the real risk to public health. Any attempt to deny Catamaran the right to ensure quality control among its network pharmacies threatens harm to the many members of its client health plans and, in turn, damages Catamaran. The lack of quality control displayed by Plaintiff reduces both safety and efficiency, elevating both risk and cost.

Throughout its briefing, Plaintiff makes self-aggrandizing claims about its "unique and unmatched services" to customers and its importance to the public health at large. Pl. Br. at 2; *see also id.* (invoking the "public interest in preserving Banks [sic] ability to serve its needy patients").[13] For instance, Plaintiff brazenly asserts that "[i]t is not hyperbole that without Banks

---

[13] *See also id.* ("Banks provides unique and unmatched services to Pennsylvania's most needy residents"); *id.* ("without Banks service its patients will suffer immediate and irreparable harm as well as create a real risk to society"); *id.* at 17 ("TRO will protect patient [sic] and prescribers that seek to use Banks and benefit from the

the Philadelphia area will have hundreds of patients without their antipsychotic medications," a problem that "will lead to many unnecessary hospitalizations and potentially countless related injuries." Pl. Br. at 24. Indeed, according to Plaintiff, the termination of its contract would trigger "a complete breakdown in the healthcare system." *Id.* [14]

### 1.     Plaintiff's Business Is Neither Unique Nor Irreplaceable

Plaintiff argues that the equities and the public interest favor a grant of injunctive relief because its absence from the market would leave a crucial void in servicing the area's at-risk patients. Central to this claim is Plaintiff's contention that "upon information and belief," the "prescriptions previously provided by Banks will now be steered to BriovaRx, Catamaran's wholly owned subsidiary specialty pharmacy," totaling "about $4,800,000 per year in additional revenue for Catamaran." Pl. Br. at 9. Repeatedly, Plaintiff attempts to establish that it is indispensable to the public health by touting services that it can provide but BriovaRx cannot. *See* Pl. Br. at 20, 21, 23.

First, although Catamaran operates a specialty pharmacy business branded BriovaRx, BriovaRx is a separate entity, and operates in complete independence from Catamaran's PBM

---

unique services the pharmacy provides"); *id.* at 18 ("Though [sic] providing exceptional pharmacy services, Banks saves lives and saves the health care system hundreds of thousands of dollars"); *id.* ("Banks has unique experience"); *id.* (termination of the contract will "jeopradiz[e] patient health and public safety"); *id.* at 20 ("Banks has saved the health care system at large significant resources that can be deployed to prevent illness rather than treat illness"); *id.* ("Banks has proven its ability to . . . save lives and lower future incidents"); *id.* ("Without Banks patients will suffer a marketable increase in readmissions); *id.* at 22 ("Banks sees higher adherence rates as a direct result of its commitment to nearly constant contact with stakeholders"); *id.* at 23 ("Banks has proven its ability to . . . save lives and lower future incidents").

[14] Such an instrumental role in fending off the wholesale collapse of the healthcare system is belied by Plaintiff's own argument that losing just 20% of its business will result in shuttered doors because physicians will be turned off by "added administrative costs and the inconvenience of keeping track of what pharmacies are able to fill for the different insurance companies." Wright Aff. at 4; Pl. Br. at 16 (business will close "because it is neither practical nor convenient . . . to spend time determining whether a pharmacy is part of a given network."). Administrative costs are, after all, a small price to pay for keeping chaos at bay.

business. Inversely, Catamaran's business decisions regarding its PBM business are not made with BriovaRx in mind, let alone for BriovaRx's financial benefit. *See* Defendant's Ex. 7, Declaration of Sandra Riley at 3. Second, in the absence of any substantiating evidence, Plaintiff's "information and belief" carries little weight. *See Touchston v. McDermott*, 120 F. Supp. 2d 1055, 1059 (M.D. Fla.) aff'd, 234 F.3d 1133 (11th Cir. 2000) (quoting 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2949 (2d ed.1995)) ("'[W]hen the primary evidence introduced is an affidavit made on information and belief rather than on personal knowledge, it generally is considered insufficient to support a motion for preliminary injunction.'").[15] Third, Plaintiff offers no explanation, let alone any evidence, of how, or why, BriovaRx would constitute the sole alternative to the services that Plaintiff currently provides. In that sense, BriovaRx constitutes a straw man: there are over two hundred specialty pharmacies in Catamaran's network in the relevant geographic area that provide delivery services. Riley Dec. at ¶ 13. At least three of those pharmacies provide local delivery services, to healthcare providers like Dr. Bonnie Wright. *Id.* The fact that, if terminated, Bank's Apothecary's territory will not go without specialty pharmacy services like those it provides is not surprising. As part of the deliberations regarding the potential termination of a pharmacy, Catamaran conducts an analysis of the relevant geographical area to ensure that members of its client health plans will have access to a sufficient number of pharmacies. *Id.* at ¶ 12. Catamaran conducted just such an analysis before making the decision to terminate Bank's. *Id.*

---

[15] Plaintiff has submitted, but has not referenced or explained in its brief, an attachment to the Declaration of Srinuvasu Maddula that it alleges shows prescriptions redirected from network pharmacies to BriovaRx. Pl. Ex. E. As explained in the attached Declaration of Kelly Pokuta, however, Plaintiff's theories regarding Catamaran and BriovaRx are baseless. These redirected prescriptions are the result of "closed networks," a cost-saving decision made by Catamaran's client health plans, not a revenue-generating decision by Catamaran. Declaration of Kelly Pokuta, attached hereto as Ex. 8, at ¶¶ 7-11.

Plaintiff's examples of its "unique" capabilities are equally inert. For instance, Plaintiff points to its ability to prescribe the Limited Distribution Drug ("LDD") Exjade as an example of its indispensable role among pharmacies. The Exjade website run by Novartis, however, identifies at least nine pharmacies (but not Bank's) capable of filling those prescriptions. Plaintiff does not mention this *or* the Novartis-run EPASS program which aids patients by arranging home delivery of Exjade and negotiating insurer red tape.[16]

Altogether, it is clear that Plaintiff is *not* the only specialty care pharmacy that can service it geographical area. In Plaintiff's own words, Bank's may believe it is a "great alternative for the Pennsylvania region" among specialty pharmacies, but it remains just that, an *alternative* among many options. Pl. Br. at 20. This fact is fatal to its argument.

### 2. The Equities and Public Health Favors Allowing Catamaran to Terminate Plaintiff's Contracts Without Intrusion

Catamaran acts now, and has acted throughout the termination process, with public safety in mind. Nonetheless, Plaintiff repeatedly characterizes the errors giving rise to its termination from the network as mere clerical errors, and insinuates that Catamaran's actions imperil its abilities to service its at-risk clients. *See* Pl. Br. br. at 3 (characterizing the audit findings as "minor discrepancies" and "clerical errors"). In doing so, however, Plaintiff not only ignores Catamaran's dedication to ensuring the safety of the members of it healthcare clients through quality control, it displays a casual disregard for the risk to the public posed by its haphazard management. As Catamaran's communications and Plaintiff's briefing make clear, the audit of Plaintiff's business revealed numerous quality control, inventory, and dispensing errors,

---

[16] Available at: http://www.us.exjade.com/health-care-professional/epass.jsp

23

including mistakes regarding NDC numbers. Contrary to Plaintiff's contentions, such errors are *not* simply clerical in nature. Because an NDC identifies the type, dose, and packaging of a drug, it is integral to the accurate dispensing of prescriptions. One does not need an expert's understanding of the pharmaceutical or healthcare industry to know that supplying a patient with the wrong type or dose of a drug places that individual at grave risk of injury or death. As Catamaran stated in its August 27, 2015 Termination Letter:

> Such discrepancies are also indicative that the pharmacist performing the final verification of the product being dispensed was not checking to ensure that the NDC for such product(s) was correct. This has extreme concerns as it represents false claims and a threat to patient safety.

Pl. Ex. D. The fact that, in *this* case, Plaintiff's errors may have involved mostly non-lethal prescriptions or products (like Bayer Contour Blood Glucose Testing Strips) is irrelevant; the same *kind* of error applied to a different product could result in significant injury or even fatality. This is the most troubling aspect of Plaintiff's memorandum: not once does it acknowledge the substantial risk that its negligent oversight posed to the public. The issue is not the specific mistakes made but rather the lack of institutional controls that allowed the mistakes to happen. That Plaintiff ignores this suggests that it has not learned from those mistakes, a fact that weighs heavily against granting the requested injunctive relief and providing Bank's the opportunity to put the public at risk yet again.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for injunctive relief should be denied.

Respectfully Submitted,

  _/s/ Joseph McHale_____
Joseph McHale, Esq.
Spencer R. Short, Esq. (To be
Admitted Pro Hac Vice)
STRADLEY RONON STEVENS & YOUNG, LLP
2600 One Commerce Square
Philadelphia, PA 19103
Phone:  (215) 564-8000
Fax:  (215) 564-8210
jmchale@stradley.com
sshort@stradley.com
*Attorneys for Defendant, Catamaran Corporation*

Dated: September 28, 2015